**NOT RECOMMENDED FOR PUBLICATION**
**File Name: 18a0396n.06**

**No. 17-3503**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Aug 07, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| CURTIS EARL TUCKER, JR., | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:    BOGGS, CLAY, and DONALD, Circuit Judges.

**BOGGS, Circuit Judge.** On March 29, 2017, a federal grand jury indicted Curtis Earl Tucker, Jr. for possessing with the intent to distribute more than 500 grams of a methamphetamine mixture, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii), and for being a felon in possession of firearms and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Tucker subsequently filed a motion to suppress evidence seized from two residences, which the United States District Court for the Northern District of Ohio granted. The government now appeals that order, arguing that investigators acted in good faith when they executed search warrants for those residences.

For the reasons outlined below, we affirm the district court's grant of Tucker's motion to suppress.

I

A

From July 2016 until February 2017, law enforcement agents electronically surveilled Camiolo Rocha-Ayon, Jr., a suspected narcotics trafficker living in Canal Winchester, Ohio. During that timeframe, officers observed Rocha-Ayon engaging in behavior that was indicative of drug trafficking. On multiple occasions, for instance, Rocha-Ayon left his residence at 5126 Algean Drive in his day-to-day vehicle, drove to a second residence at 5387 Bradshaw Street, Canal Winchester, Ohio, stayed only for a short while, and then departed in a car that he normally did not use.[1] At least once, Rocha-Ayon drove this second vehicle, a white Infiniti, to a truck stop, where an unidentified individual removed a duffel bag from the car's trunk and walked away.

On February 17, 2017, Rocha-Ayon once again left his Algean Drive home, drove to the Bradshaw Street residence, and changed vehicles. After stopping at a Columbus, Ohio, sporting-goods store to purchase a vacuum sealer and sealing bags, Rocha-Ayon traveled to 791 Saxon Avenue, Akron, Ohio and parked in the driveway. Some time after Rocha-Ayon's arrival, a white van registered to Tucker also pulled up to the residence; and although the van left shortly thereafter, it returned at 12:07 p.m. At 12:59 p.m., Rocha-Ayon departed in his white Infiniti and, on his way back to Canal Winchester, stopped at an outlet mall. Rocha-Ayon then proceeded to his Algean Drive residence, where he stayed for an unspecified period of time before returning to Bradshaw Street to switch back into his day-to-day vehicle.

Two days later, on February 19, Rocha-Ayon began this sequence anew. After leaving his Algean Drive residence in his day-to-day car, Rocha-Ayon drove to Bradshaw Street and switched

---

[1] Akron Police Department Detective M.V. Gilbride, who applied for and obtained one of the search warrants at issue in this case, stated in his affidavit that based upon his training and experience, drug traffickers avoid using their normal, day-to-day vehicles when transporting contraband.

vehicles. He then made his way to an area Wal-Mart, where he was observed placing a tan duffel bag into the trunk of his Infiniti. Approximately two minutes after he arrived at the Wal-Mart, Rocha-Ayon departed. This time, however, Rocha-Ayon did not reach his intended destination. While traveling on highway I-270, he was stopped by the Ohio State Highway Patrol for a moving violation. When a K-9 drug unit alerted to the odor of narcotics, his car was searched, and roughly 11 kilograms of cocaine was discovered in the tan duffel bag. A receipt for bulk plastic bags and a vacuum sealer, dated February 17, 2017, was also found.

Later that day, federal search warrants were issued for Rocha-Ayon's Canal Winchester residences. At the Bradshaw Street location, investigators found a vacuum sealer, scales, United States currency, wire-transfer receipts, and empty drug packaging, while at the Algean Drive residence, they discovered approximately $223,000 in U.S. currency and eight firearms.

Based upon this evidence, Akron Police Department Detective M.V. Gilbride sought a records-and-documents search warrant for the Saxon Avenue house. Citing his training and experience, as well as his observations on February 17, 2017 at 791 Saxon Avenue, Gilbride hypothesized that Rocha-Ayon had traveled to the residence "to collect drug proceeds from TUCKER to pay for [an] upcoming delivery of cocaine." Affidavit for Search Warrant for 791 Saxon Avenue ¶ 24. He further speculated that "a portion of the cocaine seized" from Rocha-Ayon was intended for Tucker, that "at least a portion of the currency recovered" from Rocha-Ayon was obtained from Tucker on February 17, and that Rocha-Ayon had purchased the vacuum sealer and bags on February 17 to conceal the odor of the currency that he was obtaining from Tucker, in the event that he was stopped by a K-9 unit during his return trip to Canal Winchester. *Ibid.* Detective Gilbride attempted to bolster his conclusions by noting that the Summit County, Ohio Auditor's Office listed Tucker as the owner of 791 Saxon Avenue; that Tucker was the

account holder for the residence's electric utilities; that the Akron Police Department had received a service call in October 2016, which suggested that drug dealing was occurring at the house; that, *inter alia*, Tucker had been convicted in 2000 for possession with intent to distribute crack cocaine[2]; and that the affidavit had been presented to and approved by "the Akron Police Legal Advisor." *Id.* at ¶¶ 25–27, 33.

On March 8, 2017, an Akron Municipal Court judge issued a search warrant for the Saxon Avenue house, permitting the seizure of:

> [b]ooks, records, receipts, notes, ledgers[,] and other papers and electronic equipment to store information relating to the possession, transportation, ordering, purchase and distribution of controlled substances, . . . bank statements and records and other items evidencing the obtaining, secreting, transfer and/or concealment and/or expenditure of money; financial proceeds, namely[,] U.S. [c]urrency, photographs, indicia of occupancy; and other fruits, instrumentalities and evidence related to drug trafficking.

Search Warrant for 791 Saxon Avenue. A search was conducted the next day, at which time officers recovered several empty vacuum-seal bags, multiple handguns (one of which was loaded), a hydraulic press with a mold, and United States currency. Investigators also found Tucker's birth certificate, vehicle registrations, and Summit County Fiscal Office records identifying him as the owner of 2123 Penguin Avenue, Akron, Ohio.

That same day, investigators obtained a records-and-documents search warrant for the Penguin Avenue residence. In addition to reciting the information contained in the Saxon Avenue affidavit and listing the evidence seized from that location, the Penguin Avenue affidavit noted that Tucker had forwarded the utilities bill for the Saxon Avenue residence to 2123 Penguin Avenue. It further stated that in April 2016, the Summit County Sheriff's Office had received a

---

[2] The affidavit also stated that Tucker had been convicted in 2012 for possession of drugs. Both parties agree and stipulate that this was an error, but that it was unintentional.

report of a domestic dispute at the address and that Tucker had been identified as a participant in it. On March 9, 2017, shortly after the warrant was issued, a search of the residence was conducted, during which three guns, United States currency, and four kilograms of methamphetamine were discovered.

B

On April 24, 2017, Tucker moved to suppress the evidence seized from the Saxon Avenue and Penguin Avenue residences on the grounds that the affidavits offered in support of the search warrants were "devoid of any evidence connecting the residences to the drug dealing activity." Tucker accordingly claimed that the affidavits failed to establish probable cause and that the good-faith exception did not apply.

After holding a suppression hearing, the district court agreed with Tucker. *United States v. Tucker*, No. 5:17–CR–105, 2017 WL 1950692, at *1 (N.D. Ohio May 11, 2017). Regarding the Saxon Avenue affidavit, the court held that it was insufficient to establish probable cause because it did "not say that Rocha-Ayon or Tucker ever went into the Saxon Avenue location on February 17"; said "almost nothing about criminal activity at the house other than that Rocha-Ayon had parked in the house's driveway"; relied on a vague, unsubstantiated, stale tip regarding drug dealing at the house; "contained no evidence that [Tucker] distributed narcotics from the . . . location, that he used the . . . location to store narcotics, or that any suspicious activity had taken place there"; and "document[ed] just a few instances when Rocha-Ayon drove the Infiniti for drug-related purposes." *Id.* at *5–6 (first alteration in original) (citation omitted). The court also found that the warrant "fail[ed] to meet the Fourth Amendment's particularity requirement" because it "sanction[ed such] a wide-ranging exploration of [the] Saxon house" that "[o]fficers could not 'readily ascertain which items were subject to seizure.'" *Id.* at *7 (quoting *United States v.*

*Anderson*, 555 F. App'x 589, 595 (6th Cir. 2014)). Finally, the court held that the good-faith exception to the exclusionary rule did not apply to the evidence seized from the Saxon Avenue residence because the affidavit was "so bare bones that it was objectively unreasonable for officers to rely on" it. *Id.* at *8. Specifically, the court faulted the affidavit for relying on the erroneous assumption that "because Rocha-Ayon, a drug dealer, visited Tucker's house once, drug activity must have taken place there." *Ibid.*

In light of these considerations, the district court further held that "evidence from the Saxon search [could not] provide the underlying basis for the Penguin house's search warrant." *Id.* at *7. Stripped of this evidence, the court found that the Penguin Avenue affidavit did not "show[ that the property had] *any* connection to drug dealing or to records of drug dealing" and, thus, that probable cause for the search was lacking. *Id.* at *8 (emphasis added). Moreover, because the court found that the Penguin Avenue affidavit "only contained 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge[,]'" it also held that the good-faith exception did not apply to the Penguin Avenue search. *Ibid.* (quoting *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996)). The court therefore excluded all evidence seized from that location. *Id.* at *9.

The government now appeals that order, though it concedes that the affidavits supporting the search warrants were insufficient to establish probable cause. Thus, the only question on appeal is whether officers acted in good faith when they executed the two search warrants.[3]

---

[3] Because the government did not argue that any of the other exceptions to the exclusionary rule applied—for instance, that the evidence seized from the residences "ultimately or inevitably would have been discovered by lawful means," *Nix v. Williams*, 467 U.S. 431, 444 (1984)—we limit our discussion to the applicability of the good-faith exception.

II

When reviewing an order suppressing evidence, we review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. White*, 874 F.3d 490, 495 (6th Cir. 2017). The applicability of the good-faith exception is a legal conclusion and, thus, is reviewed de novo. *United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006).

A

Because the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights[,]" evidence obtained in violation of the amendment should be suppressed where, but only where, the rule's "remedial objectives are . . . most efficaciously served." *United States v. Leon*, 468 U.S. 897, 906, 908 (1984) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)). Since that objective is the "deter[rence of] police misconduct rather than [the punishment of] the errors of judges and magistrates," *Leon*, 468 U.S. at 916, suppression is appropriate "[o]nly when law enforcement officials operate in 'deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights,'" *White*, 874 F.3d at 497 (quotation marks omitted) (quoting *Davis v. United States*, 564 U.S. 229, 237–38 (2011)). Accordingly, the exclusionary rule does not "bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective[,]" i.e., where "the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment." *Leon*, 468 U.S. at 905, 918–19. When determining whether the executing officers acted in good faith, we are "bound by the four corners of the affidavit . . . and . . . may not consider what the officer executing the warrant knew or believed[,]" *United States v. Rose*, 714 F.3d 362, 367 (6th Cir. 2013), unless that "extra-affidavit information was made known to the issuing magistrate[,]" *Hython*, 443 F.3d at 488.

Broadly speaking, an officer's reliance on a search warrant is not objectively reasonable where "a reasonably well[-]trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. One such situation is where the affidavit is "bare bones," i.e., is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)); *see also White*, 874 F.3d at 496. At various times, we have further defined a bare-bones affidavit as one that "states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge[,]" *United States v. Van Shutters*, 163 F.3d 331, 337 (6th Cir. 1998) (quoting *Weaver*, 99 F.3d at 1378), one that "asserts 'only the affiant's belief that probable cause existed[,]'" *White*, 874 F.3d at 496 (quoting *United States v. Williams*, 224 F.3d 530, 533 (6th Cir. 2000)), or one that is "so vague as to be conclusory or meaningless[,]" *United States v. Frazier*, 423 F.3d 526, 536 (6th Cir. 2005) (quoting *United States v. Carpenter*, 360 F.3d 591, 596 (6th Cir. 2004) (en banc)).

In contrast, an affidavit is not bare bones so long as it "contain[s] a minimally sufficient nexus between the illegal activity and the place to be searched[.]" *Carpenter*, 360 F.3d at 596. Previously, we have said that a minimally sufficient nexus exists "[i]f the reviewing court is 'able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been'—'some modicum of evidence, however slight'—'between the criminal activity at issue and the place to be searched[.]'" *White*, 874 F.3d at 497 (quoting *United States v. Laughton*, 409 F.3d 744, 749–50 (6th Cir. 2005)). Given this, "it is entirely possible that an affidavit could be insufficient for probable cause but sufficient for 'good-faith' reliance." *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004).

Such permissive language can be misleading, however; that is because not every iota of evidence qualifies as a modicum. For instance, we have been clear that "a single piece of evidence which the law of the station house shop would recognize as clearly insufficient" is so vague as to be conclusory or meaningless. *Carpenter*, 360 F.3d at 596 (quoting *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993)). More generally, an affidavit qualifies as "bare bones" where (1) a well-established legal principle precludes a finding of probable cause based upon the particularized facts it contains, (2) all reasonably well-trained officers would be acquainted with that principle, and (3) no such officer "could conclude that the present affidavit was [outside] the operation of that rule." *United States v. Savoca*, 761 F.2d 292, 297, 298 n.10 (6th Cir. 1985). One such legal principle is that "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Id.* at 297 (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978)). Precedent therefore gives guidance as to what does and does not count as a minimally sufficient nexus.

B

The Saxon Avenue affidavit is a prototypical example of a bare-bones affidavit.[4] Stripped down to its basics, the affidavit asserts that evidence of drug trafficking would be found at the Saxon Avenue residence because (1) a suspected drug dealer once parked in the driveway for a brief period of time, (2) the house's owner had a 17-year-old conviction for possession with intent to distribute, and (3) a four-month-old, seemingly unverified, apparently anonymous tip suggested

---

[4] Because this determination resolves the question of whether the good-faith exception applies to the Saxon Avenue search, we need not consider whether the exception is inapplicable on other grounds, specifically, whether the warrant was "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers [could not have] reasonably presume[d] it to be valid," *Leon*, 468 U.S. at 923 (citing *Massachusetts v. Sheppard*, 468 U.S. 981, 988–91 (1984)).

that drug dealing may have occurred there. Given that all reasonably well-trained officers must be presumed to know that "'a suspect's mere presence . . . at a residence is too insignificant a connection with that residence to establish that relationship' necessary to a finding of probable cause," *Savoca*, 761 F.2d at 297 (quoting *United States v. Flores*, 679 F.2d 173, 175 (9th Cir. 1982)); *cf. United States v. Helton*, 314 F.3d 812, 825 (6th Cir. 2003) ("A reasonable officer knows that evidence of three calls a month to known drug dealers from a house . . . falls well short of establishing probable cause that the house contains evidence of a crime."), and because the remaining evidence is not probative of drug trafficking at the residence, it was objectively unreasonable for the executing officers in this case to believe that their conduct comported with the Fourth Amendment.

The government attempts to resist this conclusion by pointing to additional, allegedly "critical" facts contained in the Saxon Avenue affidavit. Specifically, the government notes that when Rocha-Ayon visited the residence, he was driving a car that he sometimes—but not always—used in connection with drug trafficking; that prior to his arrival on February 17, Rocha-Ayon stopped to purchase household items that are sometimes—but not always—used by drug traffickers; and that two days later, Rocha-Ayon was arrested 135 miles away while transporting cocaine. Based on these additional facts, the government claims that a reasonable law enforcement officer could "easily infer" that "ROCHA-AYON JR. [had] traveled to 791 Saxon Avenue on February 17, 2017 to collect drug proceeds from TUCKER to pay for the upcoming delivery of cocaine," that "a portion of the currency recovered in ROCHA-AYON's possession was obtained from TUCKER" that day, and that Rocha-Ayon had "purchased the vacuum sealer and bags to conceal the currency he was to obtain from TUCKER[.]" Affidavit for Search Warrant for 791 Saxon Avenue ¶ 24.

Contrary to the government's assertion, no reasonably well-trained officer could draw such conclusions based upon the particularized facts in the affidavit; rather, the officers speculated based upon hunches (albeit, good hunches, as their suspicions proved correct). To see why, it helps to note what is absent from the Saxon Avenue affidavit. It does not contain any indication of drug dealing at the residence.[5] Nor does the affidavit provide any specific basis for concluding that Rocha-Ayon was transporting drugs to that location when he was arrested on February 19. Furthermore, it tells us nothing about the relationship between Rocha-Ayon and Tucker. And, most importantly, it does not mention what Rocha-Ayon did once he arrived at the residence on February 17.[6] For all that appears (and he was under surveillance), Rocha-Ayon sat quietly in his car, interacted with no one, and neither retrieved nor left anything at the address. Rocha-Ayon's purchase of drug-trafficking paraphernalia—i.e., the vacuum sealer and bags—therefore cannot constitute evidence of criminality at the Saxon Avenue residence because there is no indication that they ever left his car, let alone that they made their way into the residence.

Once the government's additional evidence is discounted, however, the Saxon Avenue affidavit "provides nothing more than a mere 'guess that contraband or evidence of a crime would be found[.]'" *White*, 874 F.3d at 496 (quoting *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994)). Because Tucker's 17-year-old conviction is not probative of whether he was using his current residence to traffic drugs, *see United States v. Christian*, 893 F.3d 846, 863 (6th Cir. 2018) ("Absent additional *recent* reliable evidence, . . . old criminal convictions cannot support a finding that drug activity is continuous at the time of the search."); *see also United States v. Brown*,

---

[5] Admittedly, the affidavit did state that four months earlier the Akron Police Department received a call, provenance unknown, which suggested that drug dealing was occurring at the house. There is no indication in the affidavit, however, that the police found the call to be credible, let alone that they found evidence corroborating the claim.

[6] The absence of such information is all the more pronounced given that the affidavit details the arrival and departure of cars from the driveway of the residence.

828 F.3d 375, 385 (6th Cir. 2016) (stating that a 12-year-old conviction for conspiracy to distribute marijuana is not probative of whether a defendant is using his residence for drug trafficking), the government's appeal rests entirely on Rocha-Ayon's brief appearance in the driveway of 791 Saxon Avenue. As noted earlier, no reasonably well-trained officer would think this sufficient to establish probable cause.

This conclusion is supported by our refusal to apply the good-faith exception in cases where there existed a more substantial nexus between the place to be searched and illegal activity. In *Helton*, for instance, a magistrate judge authorized a search warrant for a residence based on, *inter alia*, telephonic records and an anonymous tip. 314 F.3d at 820–21. Specifically, the affidavit stated that over a ten-month period, 31 calls had been made between suspected drug dealers and the residence and that a tipster had reported that the house contained "stacks" of money, some of which was being held on behalf of a suspected drug dealer. *Ibid.* We held that the affidavit was bare bones because "no reasonable officer would afford much weight to the anonymous tipster's statements" and because "[a] reasonable officer knows that evidence of three calls a month to known drug dealers from a house . . . falls well short of establishing probable cause." *Id.* at 824–25. Here, the connection between the Saxon Avenue residence and drug activity was even more tenuous, as the suspected drug dealer's (i.e., Rocha-Ayon's) interaction with the home was a one-time event and because police lacked even an anonymous informant linking the home to drug activity.

Our opinions in *Savoca*, *Van Shutters*, and *Frazier* do not contradict this analysis. As we explained in *United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006), in each of these cases, "[t]he application of the good-faith exception . . . depended on the fact that each of the defendants were known to have participated previously in the type of criminal activity that the police were

investigating." *Id.* at 526. However, unlike here, in those cases such knowledge consisted of more than a mere awareness of a long-ago conviction; rather, it constituted significant, probative evidence of the defendants' current schemes. In *Savoca*, we held that officers could infer that the defendants intended to continue their criminal activity based on the crime alleged (bank robbery) and the fact that they had perpetrated a series of such crimes, albeit at unspecified prior times. 761 F.2d at 298 n.9. In *Van Shutters*, we held that the affidavit was not bare bones because it stated that the defendant had been identified by his victims, described the items that the defendant had used to perpetrate an auto-theft scheme, and detailed his criminal activities, some of which had occurred only a few months prior to the search. 163 F.3d at 333–34, 337–38. Finally, in *Frazier*, we held that the good-faith exception applied to a search of a suspected drug dealer's current residence because two months earlier, authorities had found drugs at his former residence shortly after he had moved out. 423 F.3d at 537.

For the foregoing reasons, the district court properly refused to apply the good-faith exception to the search of the Saxon Avenue residence. We therefore affirm the district court's grant of Tucker's motion to suppress evidence seized from that location.

C

Having held that the good-faith exception does not apply to the evidence seized from Saxon Avenue, we must next consider whether this determination precludes us from finding that the officers acted in good faith when they conducted the Penguin Avenue search. Put differently, the question before us now is whether officers could have acted in reasonable, good-faith reliance on the Penguin Avenue search warrant even though the underlying affidavit was tainted by evidence obtained from the Saxon Avenue residence. Because this court has issued facially inconsistent directives on this matter, some judicial housekeeping is first necessary.

The uncertainty surrounding this issue stems from a pair of published opinions, filed ten days apart in late 2005. In *United States v. Davis*, 430 F.3d 345 (6th Cir. 2005), we stated, without qualification, that "the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure." *Id.* at 358 n.4. In the later case *United States v. McClain*, 444 F.3d 556 (6th Cir. 2005), however, we refused to apply the exclusionary rule even though the warrants in question relied in part on evidence seized during an illegal, warrantless search because (1) "the officers who sought and executed the search warrants acted in good faith" and (2) "the facts surrounding the initial . . . search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable[.]" *Id.* at 566.

Faced with these competing opinions, we are bound by *McClain*. While it is well-established that "[a] panel of this Court cannot overrule the decision of another panel[,]" *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985), it is also the case that "one panel of this court is not bound by dicta in a previously published panel opinion[,]" *United States v. Burroughs*, 5 F.3d 192, 194 (6th Cir. 1993). Because *Davis*'s discussion of the good-faith exception was dicta—not only was its analysis cursory and relegated to a footnote, the government had not argued that the good-faith exception applied—it does not constitute binding precedent. *See United States v. Fugate*, 499 F. App'x 514, 519, 519 n.5 (6th Cir. 2012). Accordingly, per *Salmi* and *Burroughs*, we must follow the holding in *McClain*. The question before us, therefore, is whether "this is one of those *unique* cases in which the *Leon* good[-]faith exception should apply despite an earlier Fourth Amendment violation." *McClain*, 444 F.3d at 565 (emphasis added).

It is not. In *McClain*, we refused to apply the exclusionary rule because we found that there was "nothing more that [the officer who executed the follow-on search] 'could have or should

have done under the[] circumstances to be sure his search would be legal.'" *Id.* at 566 (quoting

*United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985)). And we made that holding because,

*inter alia*, the circumstances of the earlier, illegal, warrantless search did not render the executing

officer's belief in the validity of the search warrants objectively unreasonable. *Ibid.* For the

limited exception recognized in *McClain* to apply here, then, it must be the case that the facts

surrounding the Saxon Avenue search were "close enough to the line of validity" that an

objectively reasonable officer could believe in the validity of a subsequent search warrant secured,

in part, on the basis of evidence seized during that earlier search. This requires, at a minimum,

that the *Leon* exception apply to the initial search; after all, if a reasonably well-trained officer

would have known that the initial search was illegal, it is hard to see how such an officer could

believe in the validity of the second warrant.

In short, when determining whether the *McClain* exception applies, it matters whether the

initial, illegal search was conducted with a warrant. When only the second search is conducted

with a warrant, as in *McClain*, we ask: (1) whether "the officers who sought and executed the

search warrants acted in good faith" as prescribed by *Leon* and (2) whether "the facts surrounding

the initial . . . search were close enough to the line of validity to make the executing officers' belief

in the validity of the search warrants objectively reasonable[.]" 444 F.3d at 566. However, when

both searches are conducted pursuant to a search warrant, each warrant must be sought and

executed by law enforcement in good faith as prescribed by *Leon*. For the good-faith exception to

apply to the evidence seized at the Penguin residence, it must therefore be the case that: (1) the

Penguin search warrant was sought and executed by law enforcement in good faith as prescribed

by *Leon*, and (2) the Saxon search warrant was sought and executed by law enforcement in good

faith as prescribed by *Leon*.

As detailed above, the problems with the Saxon Avenue search were so glaringly obvious that the *Leon* exception does not apply. *See supra* Part II.B. And because the second part of the test is not met, we need not consider whether the Penguin search warrant was sought and executed in good faith. As such, the district court was correct to hold that the good-faith exception does not bar the application of the exclusionary rule to evidence seized from the Penguin Avenue residence.

III

For the reasons stated above, we **AFFIRM** the district court's grant of Tucker's motion to suppress all evidence seized from the Saxon Avenue and Penguin Avenue residences.