RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0148p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 13-1761

RICKY BROWN,

*Defendant-Appellant*.

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cr-20281—Denise Page Hood, Chief District Judge.

Argued: July 31, 2014

Decided and Filed: June 27, 2016

Before: CLAY and STRANCH, Circuit Judges; BLACK, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Dennis G. Terez, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Stephanie M. Hays, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Dennis G. Terez, Melissa M. Salinas, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Stephanie M. Hays, UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

———————————

[*]The Honorable Timothy S. Black, United States District Judge for the Southern District of Ohio, sitting by designation.

1

---

**AMENDED OPINION**

---

JANE B. STRANCH, Circuit Judge. A jury convicted Ricky Brown of possession with intent to distribute marijuana, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm after a previous conviction of a felony offense. On appeal, Brown challenges the denial of his motion to suppress evidence seized from his residence pursuant to a search warrant. We conclude under the totality of the circumstances that the warrant was issued without probable cause and that the good-faith exception does not apply. Accordingly, we REVERSE the district court's denial of Brown's suppression motion, VACATE his convictions, and REMAND for a new trial. We do not reach Brown's challenges to the district court's evidentiary rulings.

## I. BACKGROUND

### A. The Search Warrant Affidavit

On March 30, 2011, DEA Agent Jeremy Fitch applied for a warrant to search Ricky Brown's residence on Moross Road in Detroit, Michigan. Agent Fitch's affidavit in support of the search warrant proceeded in four parts: standard recitations regarding drug crimes; facts related to the investigation of Marzell Middleton, an alleged heroin trafficker; facts related to the arrest of Middleton, Brown, and a third alleged heroin trafficker, Steven Patrick Woods; and additional facts pertaining to Brown specifically.

Agent Fitch's affidavit began with two pages of standard recitations regarding drug crimes. Agent Fitch disclosed that he had been employed as a DEA Special Agent for approximately eight months, and based on his training and experience and that of other officers with whom he had discussed the case, drug traffickers tend to keep in their residences and vehicles the types of items for which the search warrant was requested. In paragraphs 2A. through 2J. of the affidavit, Agent Fitch described the manner and means by which drug traffickers commonly generate, maintain, and conceal evidence related to drug trafficking.

The affidavit next addressed the investigation of Middleton. On March 8, 2011, a cooperating witness, identified as DEA1, provided information concerning the heroin trafficking activities of Middleton to DEA Detroit Agents and Task Force Officers assigned to Enforcement Group 3. DEA1 identified Middleton as a heroin trafficker in the Detroit metropolitan area and provided two cell phone numbers that DEA1 had used to contact Middleton. DEA1 further identified Middleton's residence on Helen Street in Detroit and stated that this residence served as the drug distribution point for Middleton.

On March 8, at the direction of DEA agents, DEA1 made a series of consensually-recorded phone calls to Middleton to set up a purchase of one-half kilogram of heroin. Surveillance units were posted at Middleton's residence before, during, and after the phone calls were made. At approximately 5:30 p.m., agents noticed a Chevrolet Silverado parked at the residence. At approximately 5:46 p.m., Middleton agreed over the phone to deliver the heroin to DEA1 at a predetermined location in Monroe, Michigan.

At approximately 7:52 p.m., DEA1 placed another consensually-recorded phone call to Middleton, who advised DEA1 that he was waiting for someone to arrive and then he would leave in "ten minutes" to deliver the heroin. At approximately 7:30 p.m. (*before* the previously-described phone call), a Yukon Denali towing a black cargo trailer arrived at Middleton's residence. Surveillance officers watched as three males got out of the Yukon and entered the residence through the north entry door. At approximately 7:50 p.m., the three males left the residence through the same door. One man had a large, dark-colored object in his hand, which he placed in the bed of the Chevrolet Silverado. The Silverado and the Yukon departed the residence and traveled to a gas station. After both vehicles were fueled, the men traveled together on Interstate 94 west to southbound I-75 into the Monroe, Michigan area.

Agent Fitch's affidavit then addressed the arrests that occurred. Because the agents believed heroin was being transported to DEA1, they arranged for MSP troopers to execute simultaneous traffic stops of the Silverado and the Yukon. At approximately 9:00 p.m., Trooper Peterson conducted a probable cause traffic stop of the Silverado and identified the sole occupant as Steven Patrick Woods. Woods verbally consented to a search of the truck. The search revealed a black, plastic power tool case in the bed of the truck. Inside the case was a clear

plastic bag containing an off-white substance weighing approximately 565 gross grams.  A field test indicated the presence of heroin.  Trooper Peterson placed Woods under arrest for possession of heroin.

At approximately 9:01 p.m., MSP Troopers Kiser and Ziecina stopped the Yukon Denali. Trooper Ziecina identified the driver as Middleton and the passenger as the defendant, Brown. Both were arrested for attempted delivery of the heroin transported by Woods in the Silverado. Trooper Ziecina recovered four cell phones from the Yukon during an inventory search. One phone was assigned (313) 449-6872, the number DEA1 had used to contact Middleton to arrange the heroin delivery. Another phone was assigned the number DEA1 told agents was Middleton's second cell phone, (313) 461-4913.  Agent Fitch concluded that the other two cell phones, (313) 254-8330 and (313) 564-9054, belonged to Brown because one of them, (313) 564-9054, listed Middleton's two cell phone numbers as contacts under "M Z."

Following the arrests, all three men were booked in Monroe, Michigan.  In answer to standard booking questions, Brown provided a residential address on Moross Road in Detroit. He possessed a Michigan driver's license listing the Moross Road address as his residence. Brown also possessed $4,813 in currency, which was seized for forfeiture under Michigan state law.  Agent Fitch averred, based on his training and experience, that the large amount of unsecured cash found in Brown's possession was consistent with drug trafficking proceeds.

Task Force Officer Powell obtained a state search warrant for Middleton's residence on Helen Street.  The warrant was executed at approximately 3:10 a.m. on March 9.  The search turned up approximately 90 gross grams of suspected heroin.

The affidavit then addressed the following additional facts pertaining to Brown.  During their search of Middleton's residence, the police also searched a 2002 GMC Yukon registered to Brown, which was parked on the street in front of the residence.[1]  MSP Trooper Unterbrink allowed a drug dog to walk around and climb into the vehicle.  The dog alerted to the odor of

---

[1]This Yukon was different from the Yukon Denali occupied by Middleton and Brown at the time of the traffic stop on March 8.

narcotics inside Brown's vehicle, but the affidavit does not indicate that any drugs were actually recovered. Agents seized the 2002 Yukon under Michigan forfeiture laws.

On March 17, nine days after Brown was arrested, Agent Fitch obtained a warrant to search the contents of the four cell phones seized from the Yukon Denali. On one of the phones believed to belong to Brown, (313) 254-8330, Agent Fitch located a text message: "He said 1175 or 1125 for one." Based on his training and experience, Agent Fitch averred that the text message was consistent with Detroit-area pricing for one ounce of cocaine. Sprint-Nextel disclosed that the subscriber information for the phone was "boost mobile." According to Agent Fitch, boost mobile phones do not require legitimate subscriber information and can be purchased and used anonymously.

Agent Fitch further averred that he conducted a search of Brown's criminal history using the NCIC system. He learned that Brown was arrested by the Detroit Police in July 1996 for delivery/manufacture of felony dangerous drugs, but he was acquitted on the charges. He also learned that Brown was convicted of conspiracy to distribute marijuana in May 1999.

Agent Fitch's affidavit did not contain any additional facts pertaining to Brown's involvement in the alleged heroin conspiracy.

Agent Fitch's affidavit concluded by summarizing the facts presented in the affidavit. Based on these facts, he averred that there was probable cause to believe that the residence on Moross Road would contain the "fruits or other evidence of a conspiracy to distribute heroin." Attachment B described the items sought in greater detail. Attachment A to both the affidavit and the search warrant described the residence on Moross Road that was the "Target Premises" to be searched.

**B.      Execution of the Search Warrant, Motion to Suppress Evidence Obtained During the Search, and Trial**

In the weeks that followed, the police obtained three search warrants: The first, a warrant to search Middleton's residence, was obtained just hours after the arrest; the second, a warrant to search the four cell phones recovered from the Yukon Denali, was obtained eight days later. Officers waited two more weeks to apply for the last, the above-described warrant to search

Brown's residence, which was issued by a federal magistrate judge on March 30—22 days after Brown's arrest. Brown was released from custody on March 9, the day after his arrest, and DEA agents did not conduct any surveillance of him after he was released.

DEA agents executed the search warrant at Brown's residence on March 31. They found a nine-millimeter Smith and Wesson semiautomatic pistol, a loaded 12-gauge shotgun, and 60 grams of marijuana. They also recovered a digital scale, various forms of ammunition, $5,805 in cash, utility bills addressed to Brown, a Michigan certificate of title and insurance document for a 2002 GMC Yukon, and a hand-written document—purportedly a drug ledger—listing names and what appeared to be gram drug quantities. They did not find heroin or any other evidence linking Brown to a heroin conspiracy.

Brown moved to suppress the evidence seized during the search of his home. The district court heard argument on the motion, but did not conduct an evidentiary hearing. Looking only to the four corners of the search warrant affidavit, the district court denied the motion to suppress, finding that the affidavit was sufficient to establish probable cause and that the evidence described in the affidavit was not stale. The district court further ruled that the *Leon* good-faith exception would apply even if the affidavit failed to establish probable cause.

Brown was tried before a jury on five charges: possession with intent to distribute heroin, conspiracy to distribute heroin, possession of a firearm after a previous conviction of a felony offense, possession with intent to distribute marijuana, and possession of a firearm in furtherance of a drug trafficking crime. Because the search of Brown's home did not produce any evidence linking him to the alleged heroin conspiracy, the heroin charges were based solely on the evidence obtained during the initial sting operation. The jury acquitted Brown on the heroin charges, but convicted him on the marijuana and firearm charges. The district court imposed a sentence of 117 months of imprisonment, and this appeal followed.

## II. ANALYSIS

Brown raises three arguments on appeal. He contends that the district court erred by denying his motion to suppress, admitting the "drug ledger" into evidence at trial, and excluding evidence of his Michigan medical marijuana license. We turn first to the suppression issue.

## A. Motion to Suppress

In reviewing the denial of a motion to suppress where the district court did not hold an evidentiary hearing, we "review de novo the court's legal conclusion that the affidavit provided probable cause." *United States v. Brown*, 732 F.3d 569, 572 (6th Cir. 2013). Given our de novo standard and the fact that our review focuses on the probable cause determination of the magistrate judge in issuing the search warrant, "we owe the district court's conclusion no particular deference." *Id.*

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The "chief evil" deterred by the Fourth Amendment is the physical invasion of the home. *Payton v. New York*, 445 U.S. 573, 585 (1980); *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003). Indeed, the right of a citizen to retreat into the home and "there be free from unreasonable governmental intrusion" stands at the core of the Fourth Amendment. *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008). The job of the magistrate judge presented with a search warrant application is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "There must, in other words, be a *nexus* between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (emphasis added and internal quotation marks omitted). Our duty as a reviewing court is to ensure that the judge had a "substantial basis for concluding that probable cause existed." *Id.* (quoting *Gates*, 462 U.S. at 214). "The review of the sufficiency of the evidence supporting probable cause is limited to the information

presented in the four corners of the affidavit." *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009).

### 1. Nexus Requirement

The Fourth Amendment concern with protection from unreasonable intrusion in the home has resulted in a wide river of cases that courts have sought, sometimes in vain, to direct into tributaries that may be applied to comparable fact patterns. Multiple cases on the nexus requirement reveal our struggle to provide guidance for such a fact-bound legal determination. One recurring fact pattern involving nexus requirements in searches related to drug trafficking is presented here.

We begin with our en banc court's exposition of the nexus requirement. In *Carpenter*, we held that because the Fourth Amendment requires a search warrant to describe particularly the place to be searched and the persons or things to be seized, the affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched. 360 F.3d at 594. The connection between the residence and the evidence of criminal activity must be specific and concrete, not "vague" or "generalized." *Id.* at 595. If the affidavit does not present sufficient facts demonstrating why the police officer expects to find evidence in the residence rather than in some other place, a judge may not find probable cause to issue a search warrant. *Id.* And of course, whether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of circumstances presented. *See Gates*, 462 U.S. at 238; *Brown*, 732 F.3d at 573.

A number of our cases illustrate situations in which the nexus is too vague or generalized to support a search warrant. In *Carpenter*, the search warrant affidavit stated only that an officer conducting helicopter surveillance had observed numerous marijuana plants growing near the residence and a road that connected the residence to the plants. 360 F.3d at 593. Although the facts in the affidavit suggested some connection between the marijuana plants and the residence, we held that they were "too vague, generalized, and insubstantial to establish probable cause." *Id.* at 595. We have similarly concluded that a search warrant affidavit failed to "establish the requisite nexus between the place to be searched and the evidence to be sought" where it stated

no more than that the defendant resided at the address and was arrested there on a non-drug offense with a quantity of crack cocaine on his person. *United States v. McPhearson*, 469 F.3d 518, 524-25 (6th Cir. 2006). We also found the nexus insufficient in a case where an informant actually identified the defendant's residence as the site of a drug operation. *See United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009). The police had not established the informant's reliability, we explained, and furthermore, the affidavit did not "assert that the informant had been inside [the defendant's] apartment, that he had ever seen drugs or other evidence inside [the defendant's] apartment, or that he had seen any evidence of a crime other than the one that occurred when [the defendant] allegedly sold him drugs." *Id.* at 390. "Without such an assertion," we concluded, "the affidavit fails to establish the necessary nexus between the place to be searched and the evidence sought." *Id.* (internal quotation marks omitted).

In the present case, the search warrant affidavit contained no evidence that Brown distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there. The affidavit did not suggest that a reliable confidential informant had purchased drugs there, that the police had ever conducted surveillance at Brown's home, or that the recorded telephone conversations linked drug trafficking to Brown's residence. The Government notes that Brown's car, which was registered to his residence, was parked outside Middleton's home and tested positively for narcotics during a canine search. Although these facts supported the search of Brown's car, they did not establish a fair probability that evidence of drug trafficking would be found at his residence. A more direct connection was required, such as surveillance indicating that Brown had used the car to transport heroin from his home to Middleton's on the day in question. The mere fact that the car was registered to Brown's home was too vague and generalized a nexus to support the search warrant.

The Government argues that the magistrate judge was entitled to infer that evidence of drug trafficking would be found at Brown's residence because he was a known drug dealer. We have acknowledged that "[i]n the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998) (citation omitted). Thus, in some cases, we have permitted judges to infer a fair probability of finding evidence in a residence even though the affidavit did not state that such evidence had been observed directly.

*See, e.g., id.* at 974-75. We have never held, however, that a suspect's "status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005). Rather, we have required some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence; that is, we have required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence.[2] *Compare Jones*, 159 F.3d at 974-75 (finding probable cause to issue a warrant where confidential informant made drug purchases from defendant, was at defendant's residence during monitored drug transactions, and observed defendant in possession of cocaine), *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011) (inference was proper because reliable confidential informant had "observed someone come out of [the defendant's] residence, engage in a drug transaction, and then return into the residence"), *and Berry*, 565 F.3d at 339 ("Although a defendant's status as a drug dealer, standing alone, does not give rise to a fair probability that drugs will be found in defendant's home, there is support for the proposition that status as a drug dealer plus observation of drug activity near defendant's home is sufficient to establish probable cause to search the home." (internal citation omitted)), *with Frazier*, 423 F.3d at 532 (inference was not proper because affidavit failed to establish informants' reliability and informants had not "witnessed [the defendant] dealing drugs from his [new] residence," just his old residence).

Our emphasis on the fact-intensive nature of the probable cause inquiry in known drug dealer cases accords with the Supreme Court's rejection of "rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach" when evaluating probable cause. *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013). This emphasis

---

[2]It is correct that in a few cases, we found the nexus sufficient even though the affidavit did not contain facts showing that the residence had been used in drug trafficking. These cases are distinct from the typical drug trafficking case, however, because the affidavits did not just establish that the defendants were drug dealers, but contained overwhelming evidence that the defendants were major players in a large, ongoing drug trafficking operation. *See United States v. Kenny*, 505 F.3d 458, 461-62 (6th Cir. 2007) (defendant, found at an operating methamphetamine lab, was identified as the "cook" for a large drug operation by an informant whose information regarding the drug operation was corroborated by independent evidence); *United States v. Miggins*, 302 F.3d 384, 388 (6th Cir. 2002) (kilogram of cocaine mailed from Los Angeles was intercepted; in police controlled delivery, defendants used an alias to sign for the package that was addressed with aliases, defendants immediately departed and upon arrest possessed paper with the aliases and address of the delivery; L.A. police identified defendants as drug traffickers; defendants admitted membership in an L.A. gang; and defendants lived together at the residence searched); *United States v. Gunter*, 551 F.3d 472, 476-77 (6th Cir. 2009) (numerous recorded conversations between informant and the defendant regarding distribution of large quantities of cocaine).

likewise comports with the Supreme Court's instruction that "[t]he critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). Finally, our totality-of-the-circumstances probable cause inquiry for search warrants for the home of an allegedly "known drug dealer" honors the Fourth Amendment's safeguards against unreasonable governmental intrusion into the home.

In sum, our cases teach, as a general matter, that if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, or the evidence of this connection is unreliable, it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer. The affidavit here lacks that necessary nexus. Given this flaw, it was not proper to infer a fair probability of finding contraband or evidence of a crime at that particular place. *See Gates,* 462 U.S. at 238.

Although this alone establishes that the warrant was issued without probable cause, we note that the evidence supposedly establishing Brown's status as a drug dealer was also inadequate. The affidavit relied on the following facts to show that Brown was a known drug dealer: Brown was a passenger in Middleton's car when the arrest was carried out. Police officers seized four cell phones from the car, two of which were believed to belong to Brown because they listed Middleton's phone number as a contact. One of Brown's alleged cell phones had a text message that said, "He said 1175 or 1125 for one," which Agent Fitch alleged referred to local cocaine prices, not heroin. Brown possessed $4,813 in currency at the time of his arrest. Brown's car was parked at Middleton's residence and, during a search of Brown's vehicle, a drug dog alerted to the odor of narcotics.

Although some of these facts suggest that Brown may have been involved in the heroin drug conspiracy—and thus established probable cause to arrest Brown—they are too inconclusive to assume, for the purpose of determining probable cause to search Brown's

residence, that he was a known drug dealer.**3** *Compare Gunter*, 551 F.3d at 476-77 (finding that defendant was a known drug dealer after identification by an informant, averment to informant's reliability in other cases, and corroboration through surveillance), *and Jones*, 159 F.3d at 974 (finding that defendant was a known drug dealer after identification by an informant and corroboration through surveillance and controlled purchases), *with Frazier*, 423 F.3d at 533 (concluding that unreliable informant's "allegation that the defendant is a drug dealer" was insufficient). Indeed, at Brown's trial, DEA Agent Jeffrey Moore was asked whether Brown was "on [his] radar" prior to his arrest on March 8. (R. 53, PageID 447.) Agent Moore answered, "[n]ot at all." (R. 53, PageID 447.) DEA agents did not identify Brown during their surveillance of Middleton's residence, and Brown was not mentioned in any of the recorded phone conversations between DEA1 and Middleton.

Agent Fitch's affidavit failed to establish the required nexus between the alleged drug trafficking and Brown's residence. Because we conclude that the police lacked probable cause to search Brown's residence on this ground, we need not also decide whether the information supporting the warrant was stale.

### 2. Good-Faith Exception

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987). If the evidence was "obtained in objectively reasonable reliance" on the "subsequently invalidated search warrant," however, it should not be suppressed. *United States v. Leon*, 468 U.S. 897, 922 (1984). For this exception to apply, the affidavit must contain "a minimally sufficient nexus between the illegal activity and the place to be searched." *Carpenter*, 360 F.3d at 596; *see also McPhearson*, 469 F.3d at 526-27 (although police discovered cocaine in defendant's pocket during search incident to arrest at residence, nexus was not minimally sufficient because these facts did not directly tie the residence to drug trafficking). A police officer does not "manifest objective good faith in relying on a warrant" if the affidavit is "so lacking in indicia of probable

---

**3**Brown's 1999 conviction for conspiracy to distribute marijuana does not change this analysis; a twelve-year-old conviction hardly proves that Brown was dealing drugs at the time of his arrest.

cause as to render official belief in its existence entirely unreasonable." *Id.* at 595 (quoting *Leon*, 468 U.S. at 923).

Here, police arrested Brown on March 8 and seized his car—registered to his residence on Moross Road—on March 9.  Although the police obtained a warrant to search Middleton's residence the day after the arrest (in fact, just six hours later, at 3:10 a.m.), they waited 22 days to file for a warrant to search Brown's residence.  It is hard to account for this delay, as little new evidence was discovered during that period:  just a cryptic text message, which Agent Fitch concluded reflected pricing for cocaine—not heroin—and a conviction for conspiracy to distribute marijuana from 1999.  Neither the text message nor the 12-year-old conviction was probative of whether Brown was using his current residence for drug trafficking.  Accordingly, if the police officers did not think the evidence established probable cause to search Brown's residence on March 9, when they sought and obtained the warrant to search Middleton's residence, the record provides no reason to think their assessment had changed by March 30.  Agent Fitch did not indicate in the affidavit that the police ever surveilled Brown's home or otherwise attempted any investigation regarding whether the residence was linked to the alleged drug conspiracy.  That would seem to indicate that they did not believe that it was.

Save for a passing reference to Brown's car registration, the affidavit is devoid of facts connecting the residence to the alleged drug dealing activity.  Although the good-faith standard is less demanding than the standard for probable cause, the affidavit still must draw some plausible connection to the residence.  Agent Fitch's affidavit failed to do so.  We thus conclude that it was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Carpenter* at 595 (quoting *Leon*, 468 U.S. at 923).  Accordingly, the good-faith exception does not apply to the evidence seized from Brown's residence, and the district court erred in denying the motion to suppress.

## B.  Evidentiary Rulings

Brown also contends that the district court erred by admitting the "drug ledger" into evidence at trial and excluding evidence of his Michigan medical marijuana license.  Because the drug ledger was discovered during the search of Brown's residence, and we hold that this

evidence should have been suppressed, we need not decide whether admitting the drug ledger into evidence was proper. The same goes for the district court's decision to exclude Brown's medical marijuana license: the license was relevant to the possession with intent to distribute marijuana charges, which rested on—and only on—evidence recovered during the illegal search. We thus do not reach the district court's evidentiary rulings.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's denial of Brown's motion to suppress, VACATE his convictions for possession with intent to distribute marijuana, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm after a previous conviction of a felony offense, and REMAND for a new trial.