J. S11046/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                                       :             PENNSYLVANIA
              v.                  :
                                         :
DAVID HAYWOOD,                      :           No. 2055 EDA 2019
                                         :
               Appellant        :

Appeal from the Judgment of Sentence Entered January 2, 2018,
in the Court of Common Pleas of Monroe County
Criminal Division at No. CP-45-CR-0000876-2016

BEFORE:  SHOGAN, J., MURRAY, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:        **FILED OCTOBER 09, 2020**

David Haywood appeals from the January 2, 2018 judgment of sentence[1] of five to ten years' imprisonment and a $30,000 fine, imposed after a jury found him guilty of possession of a controlled substance, possession with intent to deliver a controlled substance ("PWID"), possession of a small amount of marijuana, and three counts of possession of drug paraphernalia.[2] After careful review, we affirm.

---

[1] In a **separate sentencing order** entered at No. CP-45-CR-0000115-2016, appellant was sentenced to three to six years' imprisonment and a $10,000 fine, after a jury found him guilty of possession of a controlled substance, PWID, possession of a small amount of marijuana, and possession of drug paraphernalia, and the trial court found him guilty of the summary offense of making an improper right turn.  The issues appellant raises with respect to No. CP-45-CR-0000115-2016 will be addressed at Superior Court Docket No. 2032 EDA 2018.

[2] 35 P.S. §§ 780-113(a)(16), (a)(30), (a)(31), and (a)(32), respectively.

The trial court summarized the relevant facts of this case as follows:

On April 4, 2016, at [4:30 p.m.] the Pocono Township Police Department received a call from dispatch advising that a complaint of a domestic disturbance had been received from a residence at 268 Image Drive in the township. Officer Earl Ackerman responded to the residence, and Officer Robert Gupko also responded in a separate vehicle. Upon pulling into the driveway, Officer Ackerman observed [appellant] leaving the front door of the residence. He was carrying an armload of personal belongings, consisting of mostly of [sic] clothing. He had a bleeding laceration on the top of his head. Two vehicles were parked in front of the house, one of which was [appellant's] rented red Hyundai Elantra sedan. Visible in the rear of that vehicle was a pile of men's clothing. A plastic bag which appeared to contain packets of heroin was on top of the clothing.

The report to the police included a statement that a knife was involved, so the police handcuffed [appellant] and patted him down to look for a weapon. During this search, the police found a small bag of marijuana and $770.00 in cash. The police noticed the odor of marijuana about his person. When the police asked [appellant] about the altercation, he "was very evasive in explaining what had happened. I believe his excuse was he fell. He just said that he needed to get out of the residence and needed to get away."

Officer Robert Gupko was the first officer on the scene. He saw [appellant] on the front porch of the residence. He was the officer who handcuffed [appellant] and turned him over to Officer Ackerman. He then spoke to [appellant's] girlfriend, Shanace Armstrong-Woods at the door of the residence. The police did a sweep of the house to make sure that no one in the house had been the subject of violence, and to make sure there weren't violent actors hiding in the house. The police found Ms. Armstrong's mother inside the house in a wheelchair. She was living in a room close to the front

door of the residence. Ms. Armstrong-Woods['] 13[-]year-old son was upstairs. Officer Gupko could smell marijuana inside the residence. He sought the consent of Ms. Armstrong-Woods to search the residence, but that was denied. After [appellant] was placed under arrest for simple assault and transported from the scene, Officer Gupko sought a search warrant to search the house and the vehicles.

The warrant was obtained on the same day. The police searched the house and the Hyundai Elantra in front of the house that evening. In the master bedroom of the house, the police found what they believed was a small bag of cocaine, marijuana cigar papers and two small bags of marijuana. In a top right dresser drawer in the master bedroom the police found an expired temporary Pennsylvania driver's license for [appellant], a Pennsylvania driver's license belonging to Ms. Armstrong-Woods, rubber bands, packets of heroin, and a plastic bag full of smaller plastic bags; a taped-up magazine cover of a type typically used to package bricks of heroin. (50 bags.) The police found no paraphernalia in the house for ingestion of heroin.

The Commonwealth established that there were two closets in the bedroom of the house; one contained women's clothing and the other was empty. This was offered to show the jury that [appellant] had removed his clothing from the bedroom and was in the process of loading them into the car.

The police also searched the Hyundai Elantra sedan rented by [appellant]. The vehicle was parked in front of the garage of 268 Image Drive. Before the police entered the car, they observed a large amount of suspected heroin in the back seat on top of a pile of clothing. It was in a large ziplock bag. The vehicle was locked, so the police gained entry by popping the lock. Inside the car they found a pile of men's clothing on the back seat under the bag of heroin. The bag of heroin contained fifteen "bricks" of heroin consisting of 750 individual glassine packets. (Packets of 50).

Ms. Armstrong-Woods told Officer Gupko that [appellant] had rented the vehicle from Hertz.

Jennifer Libus, a forensic scientist in the Pennsylvania State Police Wyoming Regional Laboratory testified that she tested the drugs found by the police in [appellant's] vehicle and residence. She found the substances to include marijuana, approximately 1.8 grams; the chunky substance in the plastic bag contained alpha-PVP, a substituted cathinone, a bath salt; 10 white glassine packets of heroin stamped "Dab["];] 10 white glassine packets of heroin stamped "Formula 1["];] 750 white glassine packets of heroin stamped "420, Ride or Die." The heroin was determined to weigh approximately 15 grams.

Officer Christopher Shelly of the Stroud Area Regional Police Department was called as an expert in the field of narcotics investigation and drug trafficking. Officer Shelly reviewed the fact that police found 770 bags of heroin in [appellant's] house and car. He testified that the "street value" of this heroin was $7,000 to $8,000. "For a mid-level dealer, this is a decent amount of heroin." Officer Shelly said this amount of heroin was for sales, not personal use. He pointed out that [appellant] had $770 in cash on his person in low denominations, a sign of involvement in drug trafficking. The 750 bags of heroin were set up in bundles, 10 bags, or bricks, 50 bags. The magazine wrappers found in the drawer with the heroin are consistent with the manner in which New Jersey heroin sources package heroin. "They will take a magazine, they will rip a page out of the magazine, they will put the brick of heroin in there and they'll wrap it up like a present."

Trial court opinion, 6/22/18 at 1-4 (citations to notes of testimony omitted).

On June 21, 2016, appellant filed an **omnibus** pretrial motion to suppress all the physical evidence seized by police in connection with the execution of the search warrant at the Armstrong-Woods residence. Following

a hearing, the suppression court denied appellant's motion on October 27, 2016. The Commonwealth's subsequent motion to consolidate Nos. CP-45-CR-0000115-2016 and CP-45-CR-0000876-2016 was denied by the trial court on November 15, 2016. On November 14, 2017, appellant proceeded to a jury trial and was found guilty of PWID, possession of a controlled substance, possession of a small amount of marijuana, and three counts of possession of drug paraphernalia. On January 2, 2018, appellant proceeded to a sentencing hearing for both Nos. CP-45-CR-0000115-2016 and CP-45-CR-0000876-2016. (**See** notes of testimony, 1/2/18 at 27-33.) That same day, the trial court entered a separate sentencing order at No. CP-45-CR-0000876-2016, sentencing appellant to five to ten years' imprisonment and a $30,000 fine. (Sentencing order "No. 876 Criminal 2016," 1/2/18.) Appellant filed timely, joint post-sentence motions for reconsideration of sentence and a new trial based on the weight of the evidence, which were denied by the trial court. Thereafter, appellant filed separate, timely notices of appeal at each docket number, listing both docket numbers on each.[3]

---

[3] The record reflects that on July 30, 2018, appellant complied with the trial court's order and filed a timely concise statement of errors complained of on appeal, in accordance with Pa.R.A.P. 1925(b), for each corresponding docket number. On August 17, 2018, the Honorable Arthur L. Zulick filed a Rule 1925(a) opinion, addressing appellant's claims relating to the trial and post-sentence proceedings, and relying, in part, on his June 22, 2018 opinion that denied appellant's post-sentence motions. Subsequently, on August 21, 2018, the Honorable Jonathan Mark filed a supplemental Rule 1925(a) opinion, indicating that he was relying on the reasoning set forth in his prior October 27, 2016 order denying appellant's suppression motion.

Prior to consideration of the merits of this appeal, we must first address whether appellant's notice of appeal complied with the requirements set forth in the Pennsylvania Rules of Appellate Procedure and *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018). In *Walker*, our supreme court provided a bright-line mandate requiring that "where a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each case," or the appeal will be quashed. *Id.* at 971, 976-977. The *Walker* court applied its holding prospectively to any notices of appeal filed after June 1, 2018. In the instant case, the record demonstrates that appellant filed separate notices of appeal at each docket number on July 5, 2018; however, the notices of appeal referenced both docket numbers in their respective captions. A recent *en banc* panel of this court held that such a practice does not invalidate appellant's separate notices of appeal. *Commonwealth v. Johnson*, ___ A.3d ___, 2020 WL 3869723 (Pa.Super. July 9, 2020) (*en banc*). Moreover, we note that this case does not involve an appeal of a single order resolving issues arising on both docket numbers. On the contrary, the trial court entered separate sentencing orders at each docket number in this matter, and therefore, *Walker* is not implicated. Accordingly, we shall consider the merits of appellant's appeal.

Appellant raises the following issues[4] for our review:

> [I.] Whether the suppression court should have granted [a]ppellant's motion to suppress because the warrant was not supported by probable cause and not sufficiently tied to the targeted areas?
>
> [II.] Whether the trial court improperly allowed Officer Christopher Gupko to render expert opinions on drug trafficking when he was not admitted as an expert?
>
> [III.] Whether the trial court improperly allowed Officer Christopher Shelly to render opinions on who possessed narcotics, when his testimony was limited to that as an expert on drug trafficking?
>
> [IV.] Whether there was insufficient evidence to convict [a]ppellant of any of the charges, particularly considering that (1) this case arose out of a domestic violence report between [a]ppellant and his ex-girlfriend, (2) [a]ppellant's ex-girlfriend had equal access and control of the drugs, (3) the ex-girlfriend vehemently refused consent to search the home; and that (4) incriminating statements about [a]ppellant's access to the drugs were provided by the ex-girlfriend?
>
> [V.] Whether the trial court should have granted [a]ppellant's motion for a new trial based upon after-discovered evidence, where it was discovered after sentencing that [a]ppellant's ex-girlfriend was dealing in large amounts of heroin from the residence, particularly considering (1) [a]ppellant could not have

---

[4] We note that appellant filed a single brief for Nos. CP-45-CR-0000876-2016 and CP-45-CR-0000115-2016. As noted, this memorandum will address only those issues appellant raises with respect to No. CP-45-CR-0000876-2016. Any issues appellant raises with respect to No. CP-45-CR-0000115-2016 will be addressed at Superior Court Docket No. 2032 EDA 2018.

known that his ex-girlfriend was being investigate [sic] for heroin dealing by police from the very first moment of [a]ppellant's arrest and incarceration in this case, and (2) that [a]ppellant could not have known his ex-girlfriend would be charged for heroin dealing in large amounts, from the residence in which [a]ppellant was alleged to have dealt heroin, nine (9) days after [a]ppellant's sentencing in this case?

Appellant's brief at 6-8 (citations to notes of testimony, extraneous capitalization, and footnote omitted).[5]

## I. Motion to Suppress

Appellant's claim with regard to the denial of his suppression motion is two-fold. Appellant first argues the suppression court erred in denying his suppression motion "because the warrant was not supported by probable cause and not sufficiently tied to the targeted areas[.]" (***Id.*** at 6, 33.)

Our standard of review when addressing a challenge to a trial court's denial of a suppression motion is well settled.

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the

---

[5] For the ease of our discussion, we have renumbered appellant's issues.

suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous.

***Commonwealth v. Jones***, 121 A.3d 524, 526 (Pa.Super. 2015) (citation omitted; brackets in original), ***appeal denied***, 135 A.3d 584 (Pa. 2016).

Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution mandate that search warrants must be supported by probable cause. ***Commonwealth v. Johnson***, 42 A.3d 1017, 1031-1032 (Pa. 2012), ***cert. denied***, 569 U.S. 922 (2013).

[T]he question of whether probable cause exists for the issuance of a search warrant must be answered according to the totality of the circumstances test articulated in ***Commonwealth v. Gray***, [] 503 A.2d 921 (Pa. 1985), and its Pennsylvania progeny, which incorporates the reasoning of the United States Supreme Court in ***Illinois v. Gates***, 462 U.S. 213, 103 S.Ct. 2317 [] (1983). The task of the magistrate acting as the issuing authority is to make a practical, common sense assessment of whether, given all the circumstances set forth in the affidavit, a fair probability exists that contraband or evidence of a crime will be found in a particular place. A search warrant is defective if the issuing authority has not been supplied with the necessary information. The chronology established by the affidavit of probable cause must be evaluated according to a common sense determination.

***Commonwealth v. Arthur***, 62 A.3d 424, 432 (Pa.Super. 2013) (some citations and internal quotation marks omitted), ***appeal denied***, 78 A.3d 1089 (Pa. 2013). "We must limit our inquiry to the information within the four corners of the affidavit submitted in support of probable cause when

determining whether the warrant was issued upon probable cause." *Commonwealth v. Burgos*, 64 A.3d 641, 656 (Pa.Super. 2013) (citation omitted), *appeal denied*, 77 A.3d 635 (Pa. 2013).

Upon review, we find that the record supports the suppression court's determination that the affidavit of probable cause upon which the search warrant was based set forth sufficient information within its four corners to justify the issuance of a search warrant. The affidavit of probable cause consisted of 12, single-spaced paragraphs detailing Officer Gupko's extensive training in narcotics investigation and his April 4, 2016 response to a domestic disturbance at the residence shared by appellant and Armstrong-Woods. (*See* "Application for Search Warrant – Affidavit of Probable Cause," 4/4/16 at 2-3.) The affidavit indicates that upon arriving at the residence, Officers Gupko and Ackerman encountered appellant with an armload of clothing attempting to move items to his vehicle. (*Id.* at 3, ¶ 6.) The affidavit further indicates that after speaking with appellant, the officers detected a "strong odor of marijuana" emanating from appellant's person. (*Id.*) The affidavit also indicates that Officer Gupko spoke with Armstrong-Woods, who informed him that she and appellant had argued over their finances, which culminated with appellant's grabbing a knife and demanding her keys. (*Id.* at ¶ 7.) Based on these observations, the officers placed appellant under arrest and conducted a frisk of his person, which yielded a small plastic bag containing 2.4 grams of marijuana. (*Id.*) The affidavit also indicates that while speaking with

Armstrong-Woods, both officers detected a strong odor of raw marijuana coming from inside the residence. (*Id.* at ¶ 8.) When questioned about this observation, Armstrong-Woods stated that appellant had smoked marijuana inside the residence earlier in the day, which appellant later confirmed at the police station. (*Id.* at ¶¶ 8-9.) The affidavit also indicates that two vehicles were parked in the driveway of the residence at this time, one of which was a rental vehicle. (*Id.* at ¶ 10.) Additionally, the affidavit indicates that the officers were aware of appellant's extensive criminal history, which included no less than ten drug-related arrests since 2002. (*Id.* at ¶ 11.)

Based on the foregoing, we find that the record supports the suppression court's conclusion that "[t]hese circumstances . . . establish a fair probability that contraband or evidence of a crime would be discovered in the residence and vehicles located on the property." (Suppression court order, 10/27/16 at 2.) Accordingly, appellant's contention that the warrant was not supported by probable cause nor sufficiently tied to the targeted areas must fail.

Appellant next argues that there is an insufficient nexus between the affidavit of probable cause and the areas searched, including his rental vehicle. (Appellant's brief at 20, 35-41.) In support of this contention, appellant relies on *United States v. Brown*, 828 F.3d 375 (6th Cir. 2016), and *Commonwealth v. Flaherty*, 583 A.2d 1175 (Pa.Super. 1990).

Pennsylvania Rules of Criminal Procedure 205 and 206 mandate that an application for a search warrant and accompanying affidavit of probable cause

must contain, ***inter alia***, the "name or describe with particularity the person or place to be searched[.]" Pa.R.Crim.P. 205(3); Pa.R.Crim.P. 206.

Contrary to appellant's contention, our review indicates that the April 4, 2016 application for the search warrant sets forth a description of the premises to be searched with the requisite specificity:

> 268 Image Dr. 268 is in a red multi[-]unit town house. Apartment 268 is on the left side if you are facing the residence from the street. The residence is a multi level unit with a main floor and basement area, on the outside of the residence is red texture 111 siding on a concrete block foundation. The number 268 is marked on the outside entry door. There are two vehicles in the residence a 2006 Maroon Chevrolet Trailblazer bearing PA registration JPC6623 registered to Samoy COX [(the sister of appellant's girlfriend)] and a West Virginia registration 6YU367 registered to PV holdings corporation in Charleston[,] South Carolina [(appellant's rental vehicle)].

Application for search warrant, 4/4/16 at 1, 5.

Moreover, we find that appellant's reliance on ***Brown*** and ***Flaherty*** is misplaced. ***Brown*** involved a situation where police sought a search warrant for the defendant's home after they recovered drugs from a car that was parked at a codefendant's house but was registered to the defendant's home address. ***Brown***, 828 F.3d at 379-380. The affidavit also stated that the defendant had a criminal history involving drug offenses. ***Id.*** at 380. The Sixth Circuit Court of Appeals rejected the Commonwealth's argument that these facts were sufficient to establish probable cause to search the defendant's residence, noting that, "whether an affidavit establishes a proper

nexus is a fact-intensive question resolved by examining the totality of the circumstances presented." *Id.* at 382. The ***Brown*** court held that "if the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity, . . . it cannot be inferred that drugs will be found in the defendant's home—even if the defendant is a known drug dealer." ***Id.*** at 384.

***Brown*** is factually distinguishable from the instant matter. Unlike ***Brown***, the affidavit in this case did not fail to "draw some plausible connection to the residence" or his vehicle. ***See id.***, 828 F.3d 385. Appellant's vehicle was parked in the driveway directly outside of the residence and not at the home of an unrelated, third party. ("Application for Search Warrant – Affidavit of Probable Cause," 4/4/16 at 3, ¶ 10.) Moreover, the arresting officers' knowledge of appellant's extensive criminal history in drug trafficking was but one factor set forth in the affidavit of probable cause in support of the search warrant. (***See id.*** at ¶ 11.)

Similarly, ***Flaherty*** is distinguishable. ***Flaherty*** involved an informant who told police that the defendant will "deliver pills to special customers using his car" that he had just purchased with profits from his drug dealing. ***Flaherty***, 583 A.2d at 1176. Based on these allegations, the police obtained and executed a warrant while defendant was washing his car. ***Id.*** at 1177. The ***Flaherty*** court affirmed the trial court's order suppressing evidence of drugs seized from the defendant's automobile. ***Id.*** at 1176. In reaching this

decision, the *Flaherty* court held that there was no probable cause to believe that there were drugs in the car at the time the warrant was issued, as the informant did not indicate that he had ever seen drugs in the car and only implicated the defendant in future conduct. *Id.* at 1178-1179.

Unlike in *Flaherty*, the warrant in this case **was not executed** without independent corroboration that any illegal drug activity was occurring on the premises. *See id.*, 583 A.2d at 1178-1179. As noted, upon arriving at the scene, Officers Gupko and Ackerman detected a "strong odor of marijuana" emanating from both appellant's person and the residence itself. ("Application for Search Warrant – Affidavit of Probable Cause," 4/4/16 at 3, ¶ 8.) Additionally, appellant was observed moving an armload of personal belongings from the residence to his vehicle. (*Id.* at ¶ 6.)

Based on the foregoing, appellant's contention that the evidence seized by police should have been suppressed pursuant to **Brown** and **Flaherty** must fail.

## II. Officer Gupko's Testimony

Appellant next argues that the trial court abused its discretion in permitting Officer Gupko to render an expert opinion on drug trafficking when he was not admitted as an expert. (Appellant's brief at 41.) The record belies this claim.

"[T]he admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." ***Commonwealth v. Fransen***, 42 A.3d 1100, 1106 (Pa.Super. 2012) (citation omitted), ***appeal denied***, 76 A.3d 538 (Pa. 2013). "An abuse of discretion is not merely an error of judgment; rather discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record." ***Commonwealth v. Antidormi***, 84 A.3d 736, 745 (Pa.Super. 2014) (citation omitted), ***appeal denied***, 95 A.3d 275 (Pa. 2014).

Pennsylvania Rule of Evidence 701 governs the admission of opinion testimony by lay witnesses and provides as follows:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a)   rationally based on the witness's perception;
>
> (b)   helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c)   not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701(a)-(c).

Rule 702, in turn, governs the admission of expert witness testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702(a)-(c).

We have explained that,

> [a] witness can qualify as both a fact and expert witness and an expert may base an opinion on fact or data in the case that the expert has personally observed. . . . [a] law-enforcement officer's testimony is a lay opinion if it is limited to what he observed ... or to other facts derived exclusively from [a] particular investigation. On the other hand, an officer testifies as an expert when he brings the wealth of his experience as [an] officer to bear on those observations and ma[kes] connections for the jury based on that specialized knowledge.

***Commonwealth v. Huggins***, 68 A.3d 962, 969 (Pa.Super. 2013) (citations and internal quotation marks omitted; brackets in original), ***appeal denied***, 80 A.3d 775 (Pa. 2013).

Here, Officer Gupko testified at great length with regards to his training and experience in narcotics investigations, his response to the scene on April 4, 2016, and his subsequent execution of a search warrant at appellant's

- 16 -

residence. At trial, Officer Gupko was questioned about the significance of the cash found on appellant's person following his arrest, and opined, over appellant's objection, as follows:

> Q. So the large denominations -- did the large denominations of money or a large sum of money have significance to you as a whole in this scenario?
>
> A. Yeah, it would.
>
> Q. And what would that significance be?
>
> A. **That would -- drug dealers, when we deal with them, they carry a lot of money with them, whether it's from dealing all day or if they go [to] what we call "re-up," which is [to] go to wherever they go to get more drugs. They would have a bunch of money with them. Most of the time they have a large sum of cash with them.**
>
> . . . .
>
> Q. Did that quantity of the denominations of money -- does that have significance to you to the quantity of heroin that was found in the vehicle?
>
> A. **The particular amount of money versus what was found in the vehicle -- what was found in the vehicle would be worth way more than what was found on [appellant]. The street value of the exact -- I guess you would have to break it down into if it was sold in individual packets or all together. But the actual value of what was recovered versus what he had in his pocket or any correlation between it -- the best answer I can give you is that drug dealers carry a lot of money, and that's just part of the game.**

Notes of testimony, 11/14/17 at 106-107 (emphasis added).

Upon review, we discern no abuse of discretion on the part of the trial court in permitting this testimony to be admitted into evidence. The record indicates that Officer Gupko was present at the scene when Officer Ackerman searched appellant incident to his arrest and found $770 in cash on his person. (**See** notes of testimony, 11/14/17 at 105.) Officer Gupko's testimony was clearly based upon his investigation of the crime scene and his nine years' experience as part of the Monroe County Drug Task Force. (**See** notes of testimony, 11/14/17 at 45-55.) Contrary to appellant's contention, this is not the type of "scientific, technical, or other specialized knowledge within the scope of Rule 702." Pa.R.E. 701(c). As the trial court properly recognized, the fact that "drug dealers often are found with large sums of cash . . . is not a novel concept, and the jurors knew exactly how much cash [appellant] had and the circumstances at the time of his arrest[.]" (Trial court Rule 1925(a) opinion, 8/17/18 at 4-5.) Accordingly, appellant's evidentiary challenge must fail.

## III. Scope of Officer Shelly's Expert Testimony

Appellant next contends that the trial court abused its discretion in allowing Officer Shelly to improperly "render an opinion on who possessed narcotics[,]" when his testimony was limited to that as an expert on drug trafficking. (Appellant's brief at 42.) We disagree.

"[T]he rules [of evidence] governing expert and lay testimony do not preclude a single witness from testifying, or offering opinions, in the capacity as both a lay and an expert witness on matters that may embrace the ultimate issues to be decided by the fact-finder." *Commonwealth v. Yocolano*, 169 A.3d 47, 62 (Pa.Super. 2017) (citation omitted). Rule 704 states that "[a]n opinion is not objectionable just because it embraces an ultimate issue[]" to be decided by the trier of fact. Pa.R.E. 704. Moreover, we recognize that

> the witness'[s] association to the evidence controls the scope of admissible evidence that he or she may offer. . . . [S]hould a single witness testify in dual capacities, the trial court must instruct the jurors regarding lay versus expert testimony and [tell] them that they [are] solely responsible for making credibility determinations.

*Yocolano*, 169 A.3d at 62, quoting *Huggins*, 68 A.3d at 967, 973 (internal quotation marks omitted).

At trial, Officer Shelly was qualified as an expert in the field of narcotics investigation and drug trafficking and testified at length with regard to how "bricks" of heroin are packaged by various dealers in Monroe County. (Notes of testimony, 11/14/17 at 142-150.) Officer Shelly was also asked to render his expert opinion based upon the testimony he heard from Officer Ackerman and Officer Gupko and his observation of the evidence seized in this case. (*Id.* at 151.) In doing so, Officer Shelly opined that both the quantity and particular packaging of the "bricks" of heroin that were found in appellant's

dresser drawer and rental vehicle indicated that he was buying the bricks of

heroin for resale:

> A. There is [sic] 770 bags of heroin. Twenty of the bags were located in [appellant's] residence. The other 750 bags were located in a rental car under his name. That is a substantial amount of heroin.
>
> . . . .
>
> There's no way, in my opinion, that any type of this amount of heroin could ever be used for personal use. . . .
>
> . . . .
>
> Q. As it relates to the packaging of the narcotics in this case, can you tell the jury why that is significant to you as it relates to trafficking[?]
>
> A. Sure. Once again, he has this packaged -- so the 750 individual bags of heroin -- we talk about packaging. When you have several little packets, it's already broken up for sale. In this case, 770 bags of heroin is [sic] broken up individually for sale or to sell by bundle, which is 10 bags, or to sell by brick, which is 50 bags. And that's the way his packaging was set up.
>
> Q. In reviewing all of the evidence displayed here, were you able to draw any other conclusions as it relates to the heroin obtained in this case?
>
> A. Yes. One thing I didn't touch on -- and I'm sorry -- it's actually not in this photo, but the brick wrappers that were located also in the drawer with the heroin. Again, New Jersey packages of heroin -- I don't know why they package it this way, but they do. It's been that way for my last 15 years.

> They will take a magazine, they will rip a page out of the magazine, they will put the brick of heroin in there and they'll wrap it up like a present. They will put that -- whether it's 20 bricks, 30 bricks, 40 bricks, or whatever it's going to be, and they will use tape and they'll tape the heroin. It's usually in pornographic magazines. I'm not sure why. It's just usually the way it comes. I've also seen it with lottery tickets.
>
> But that was located in the drawer with [appellant's] ID, as well with the heroin, which is showing he's buying bricks of heroin at a time.

*Id.* at 151-154.

Appellant's counsel objected to Officer Shelly's "conclusions about who possessed or sold the drugs" as beyond the scope of his expertise, and the trial court overruled his objection, indicating that appellant's counsel could address this point on cross-examination. (*Id.* at 154-155.) The record reflects that appellant's counsel did not question Officer Shelley at length on this point during cross-examination. (*See id.* at 156-158.)

Upon review, we discern no abuse of the trial court's discretion in allowing this testimony to be admitted into evidence. Officer Shelly's testimony was properly admitted pursuant to *Yocolano* and Rule 704. Officer Shelly utilized evidence discovered during the course of the investigation to render his expert opinion on the quantity and packaging of the heroin found during the investigation. Although Officer Shelly did not personally observe appellant purchase the 20 bricks of heroin found in his bedroom, Officer Shelly's inference from the heroin's packaging that it had

been purchased for resale by appellant "embrace[d] the ultimate issue[] to be decided by the fact-finder." **See Yocolano**, 169 A.3d at 62. Moreover, the record reflects that the trial court properly instructed the jury pursuant to **Yocolano** on the differences between lay and expert testimony and how to evaluate each. (**See** notes of testimony, 11/14/17 at 188-191.) Accordingly, appellant's claim of trial court error must fail.

## IV.  Sufficiency of the Evidence

Appellant next argues that there was insufficient evidence to sustain his convictions for possession of a controlled substance and PWID. (Appellant's brief at 43.)

> In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to prove every element of the offense beyond a reasonable doubt. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. Any question of doubt is for the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

**Commonwealth v. Thomas**, 988 A.2d 669, 670 (Pa.Super. 2009) (citations omitted), **appeal denied**, 4 A.3d 1054 (Pa. 2010).

To sustain a conviction for the crime of possession of a controlled substance, the Commonwealth must prove that appellant "knowingly or intentionally possess[ed] a controlled or counterfeit substance" without being

properly registered to do so under the act. 35 P.S. § 780-113(a)(16). The crime of PWID requires the Commonwealth to prove an additional element: that appellant possessed the controlled substance with the intent to manufacture, distribute, or deliver it. 35 P.S. § 780-113(a)(30).

Here, the crux of appellant's claim is that the Commonwealth failed to prove that "[he] was the individual in possession or control of the narcotics" found in his vehicle and the bedroom he shared with his girlfriend. (Appellant's brief at 43-45.) In situations where it cannot be proven that a suspect had the narcotics on his person, the Commonwealth is required to prove constructive possession. *See Commonwealth v. Hopkins*, 67 A.3d 817, 820 (Pa.Super. 2013), *appeal denied*, 78 A.3d 1090 (Pa. 2013).

> Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as conscious dominion. We subsequently defined conscious dominion as the power to control the contraband and the intent to exercise that control.

*Commonwealth v. Brown*, 48 A.3d 426, 430 (Pa.Super. 2012) (citations and internal quotation marks omitted), *appeal denied*, 63 A.3d 1243 (Pa. 2013). As with any other element of a crime, the Commonwealth may sustain its burden of proving constructive possession by means of wholly circumstantial evidence. *Hopkins*, 67 A.3d at 820.

Courts in this Commonwealth have long recognized that two persons may constructively possess narcotics at the same time. *Commonwealth v. Katona*, 191 A.3d 8, 12 (Pa.Super. 2018), *appeal granted*, 200 A.3d 8 (Pa. 2019); *see also Commonwealth v. Johnson*, 26 A.3d 1078, 1094 (Pa. 2011) ("constructive possession may be found in one or more actors where the item [at] issue is in an area of joint control and equal access." (citation and internal quotation marks omitted)). A marital relationship between the parties is not necessary. *See Commonwealth v. Jackson*, 659 A.2d 549, 550 (Pa. 1995), citing *Commonwealth v. Mudrick*, 507 A.2d 1212, 1213-1214 (Pa. 1986).

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that there was sufficient evidence to establish that appellant constructively possessed the narcotics found in his vehicle and the bedroom he shared with Armstrong-Woods. The record establishes that police found the following items in a dresser located in the master bedroom of Armstrong-Woods' residence: appellant's expired temporary Pennsylvania driver's license; a Pennsylvania driver's license belonging to Armstrong-Woods; rubber bands; packets of heroin; a plastic bag full of smaller plastic bags; and a taped-up magazine cover similar to those typically used to package bricks of heroin. (Notes of testimony, 11/14/17 at 62.) The record further establishes that police also found a small bag of what they believed to be cocaine, marijuana cigar papers, and two

small bags of marijuana in the master bedroom. (***Id.*** at 58-59.) Additionally, no paraphernalia for the ingestion of heroin was found in the residence. (***Id.*** at 71.)

The Commonwealth presented evidence at trial to establish that there were two closets in the residence's master bedroom, one that contained women's clothing and the other of which was empty. (***Id.*** at 83.) Additionally, Officer Ackerman testified that when he arrived on the scene, he observed appellant exiting the residence and walking towards his vehicle with an armful of personal belongings and clothing. (***Id.*** at 29, 33.) Officer Ackerman opined that appellant was trying to leave in said vehicle, and Armstrong-Woods later informed the officers that appellant had rented this vehicle from Hertz. (***Id.*** at 33, 76.) A subsequent search of this vehicle yielded a large ziplock bag sitting in plain view on top of a pile of men's clothing in the back seat, which contained 15 "bricks" of heroin consisting of 750 individual glassine packets. (***Id.*** at 72-73.)

Based on the foregoing, we find that the Commonwealth presented sufficient evidence for the jury to conclude that appellant possessed "the power to control the [narcotics] and the intent to exercise that control." ***See Brown***, 48 A.3d at 430. Accordingly, appellant's sufficiency claim must fail.

## V. After-Discovered Evidence

In his final issue, appellant contends that the trial court should have granted his motion for a new trial based upon after-discovered evidence "that [Armstrong-Woods] was dealing in large amounts of heroin from the residence" with another individual. (Appellant's brief at 8, 45-50.)

> After-discovered evidence is the basis for a new trial when it: 1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of trial by the exercise of reasonable diligence; 2) is not merely corroborative or cumulative; 3) will not be used solely for impeaching the credibility of a witness; and 4) is of such nature and character that a new verdict will likely result if a new trial is granted. Further, the proposed new evidence must be producible and admissible.

*Commonwealth v. Chamberlain*, 30 A.3d 381, 414 (Pa. 2011) (citations and internal quotation marks omitted), *cert. denied*, 566 U.S. 986 (2012).

Here, the trial court authored a comprehensive and well-reasoned opinion that thoroughly addresses and disposes of appellant's after-discovered evidence claim. Specifically, we agree with the trial court that appellant failed to present any evidence that "[Armstrong-Woods] was involved with drug-dealing with another person besides [appellant] at the time of [his] arrest." (Trial court opinion, 6/22/18 at 9-10.) Additionally, we agree that "evidence of [Armstrong-Woods'] actions in January 2018 would not be relevant in a trial of [appellant] for his actions on April 4, 2016." (*Id.* at 10.) Accordingly, we adopt the pertinent portions of the trial court's well-reasoned

June 22, 2018 opinion as our own for purposes of this appellate review. (**See**

**id.** at 8-10.)[6]

For all the foregoing reasons, we affirm the trial court's January 2, 2018

judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/9/20

---

[6] The trial court's opinion also addresses appellant's sufficiency of the evidence claim, which we addressed in detail at Subsection IV, **infra**.